# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>and<br><br>STATE OF NEW HAMPSHIRE<br><br>           Plaintiffs,<br><br>       vs.<br><br>HARVARD PILGRIM HEALTH CARE, INC.<br><br>and<br><br>HEALTH PLAN HOLDINGS, INC.<br><br>           Defendants. | Civil Action No.:_____ |

# COMPLAINT

The United States of America and the State of New Hampshire bring this civil antitrust action to block the proposed merger of Harvard Pilgrim Health Care and Health Plan Holdings (f/k/a Tufts Health Plan). The combination of Harvard Pilgrim and Health Plan Holdings—two of the largest suppliers of health insurance in New Hampshire for certain employers purchasing group coverage for their employees—into one firm would likely lead to higher prices, lower quality, and reduced choice for consumers of commercial group health insurance in New Hampshire. To prevent this harm to consumers, the United States and the State of New Hampshire seek an injunction to stop the proposed merger. Plaintiffs allege as follows:

## I.     INTRODUCTION

1. Health insurance is an integral part of the American healthcare system. Americans collectively spend trillions of dollars on healthcare each year, and the cost of healthcare impacts almost every American. Consumers depend on health insurance to secure affordable access to doctors and hospitals and to protect themselves from the risk of medical expenses that could be financially devastating.

2. Half of all Americans obtain health insurance coverage through their employers. Employers purchase group health insurance plans for their employees from insurance companies such as Harvard Pilgrim and Health Plan Holdings. Competition between insurance companies like Harvard Pilgrim and Health Plan Holdings ensures that employers can purchase high-quality group health insurance plans for their employees at affordable prices.

3. Harvard Pilgrim sells commercial group health insurance plans to small and large employer groups in New Hampshire. Health Plan Holdings sells commercial group health insurance plans to small and large employer groups in New Hampshire through Tufts Health Freedom Plan, Inc. ("Tufts Freedom").

4. In New Hampshire, Harvard Pilgrim and Tufts Freedom are two of the three top companies offering commercial group health insurance plans to (1) private small group employers with up to 50 full-time eligible employees ("small groups") and (2) private large group employers with between 51 and 99 full-time eligible employees, a segment of commercial large group health insurance referred to as community rated by class or "CRC" by Defendants and others in the industry ("CRC groups"). Competition between Harvard Pilgrim and Tufts Freedom has resulted in lower premiums, richer (*i.e.*, more robust and comprehensive) plan benefits, and better service for small groups and CRC groups in New Hampshire.

5. Combining Harvard Pilgrim and Health Plan Holdings into one firm would eliminate this competition, likely raising the price and reducing the quality of commercial health insurance sold to small groups and to CRC groups in New Hampshire.

6. As a result, the proposed transaction is likely to substantially lessen competition for commercial health insurance sold to small groups and to CRC groups, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. The Court, therefore, should enjoin this transaction.

## II.     DEFENDANTS AND THE TRANSACTION

7. Harvard Pilgrim sells commercial group health insurance to small and large employer groups in four states: New Hampshire, Massachusetts, Connecticut, and Maine. Harvard Pilgrim's annual revenue in 2019 was approximately $3 billion, and it has over one million members.

8. Health Plan Holdings sells commercial group health insurance to small and large employer groups in New Hampshire through Tufts Freedom, which until September 2020 was a joint venture with the Granite Healthcare consortium consisting of several large New Hampshire health systems and now is solely owned by Health Plan Holdings. It also sells commercial group health insurance in Massachusetts and Rhode Island. Health Plan Holdings' annual revenue in 2019 was over $5.5 billion, and it has over one million members.

9. Defendants have agreed to a "merger of equals," which was memorialized in a Combination Agreement dated August 9, 2019 (the "Transaction").

## III.     JURISDICTION AND VENUE

10. This Court has subject-matter jurisdiction under Section 15 of the Clayton Act, 15 U.S.C. § 25, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

11. The State of New Hampshire brings this action in its sovereign capacity as *parens patriae* on behalf of and to protect the health and general welfare of its citizens and the general economy of the State under Section 16 of the Clayton Act, 15 U.S.C. § 26 and under N.H. Rev. Stat. Ann. 356:4-a & 4-b, seeking injunctive and other relief from Defendants' violation of Section 7 of the Clayton Act, 15 U.S.C. § 18 and state antitrust law.

12. Defendants are engaged in activities that substantially affect interstate commerce. Defendants sell health insurance and administrative services for which employers and consumers remit payments across state lines, and Defendants otherwise participate in interstate commerce.

13. Venue is proper under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. §§ 1391(b) and (c).

14. This Court has personal jurisdiction over each Defendant. Harvard Pilgrim is headquartered in Wellesley, Massachusetts and transacts business in this district. Health Plan Holdings is headquartered in Watertown, Massachusetts and transacts business in this district. Both Harvard Pilgrim and Health Plan Holdings have consented to personal jurisdiction and the acceptance of service of process in this district for purposes of this matter. The Transaction would also have effects on employers and consumers in this district.

## IV.   THE RELEVANT MARKETS

15. Commercial group health insurance is sold by health insurance companies to employers to provide health insurance coverage to their employees and their employees' families. Employers cover at least a portion of the cost of the insurance for their employees, making it a cost-effective way for employees, and their families, to obtain health insurance.

16. Insurers offering commercial group health insurance plans to employers try to make them attractive by competing on price, product design, customer service, care

4

management, wellness programs, and reputation.  Insurers also compete based on the breadth of their network of healthcare providers, including doctors and hospitals, as employers seek an insurance plan that offers in-network access to medical providers that are close to where their employees live and work.  An insurer's ability to compete on price depends largely on medical costs, which are impacted significantly by the discounts the insurer obtains from medical providers.

17. In New Hampshire, Harvard Pilgrim and Health Plan Holdings compete vigorously with one another in the sale of commercial health insurance to small groups and to CRC groups.

18. The Transaction is likely to harm competition in two health insurance markets in New Hampshire: (1) the sale of commercial group health insurance to small groups and (2) the sale of commercial group health insurance to CRC groups.  For both of these markets, employers tend to be local, with the majority of their employees based in New Hampshire, although some employers offer insurance to employees in multiple states.  Competition to win small groups and CRC groups in New Hampshire is primarily driven by which insurer offers the lowest rates.  Small groups and CRC groups, as defined in this complaint, do not include governmental employers (*e.g.*, municipalities, school districts) in New Hampshire with fewer than 100 employees, as historically almost all those employers have purchased health insurance through a trust instead of directly from an insurer.

    **A.**    **Commercial Health Insurance Sold to Small Groups**

19. The sale of commercial health insurance to small groups in New Hampshire is a relevant antitrust product market in which to analyze the effects of the Transaction.  New Hampshire Insurance Department regulations define a "small group" as an employer with 50 or

fewer full-time eligible employees.  For small groups, health plans are typically fully insured, which means that the employer pays a premium to the insurance company and in return the company covers the employees' healthcare costs. Small groups tend to be local in nature, requiring a strong local provider network.

20. The commercial health insurance plans offered to small groups are governed by the New Hampshire Insurance Department and cannot be substituted with plans offered to New Hampshire employers with 51 or more full-time eligible employees, defined by statute as "large group."  Harvard Pilgrim and Health Plan Holdings also differentiate small group accounts separately from large group accounts internally and offer different pricing for small group accounts compared to large group accounts.

21. New Hampshire law does not require that an insurer offer a small group product statewide and therefore permits an insurer to offer small group plans only in certain counties. Accordingly, despite the fact that state law does not allow insurers to charge different prices for the same small group plans based on location, insurers can offer a more expensive set of small group plans in one part of the state, and a less expensive set of different small group plans in another part of the state.  This allows insurers to charge different prices for different products to small groups based on where employees live and work. The Transaction is likely to substantially lessen competition for the sale of commercial health insurance to small groups in all seven of New Hampshire's Core Based Statistical Areas ("CBSA"):  (1) the Manchester-Nashua CBSA, (2) the Concord CBSA, (3) the Laconia CBSA, (4) the Keene CBSA, (5) the Berlin CBSA, (6) the New Hampshire counties (Grafton and Sullivan) of the Lebanon NH-VT CBSA, and (7) the New Hampshire counties (Rockingham and Strafford) of the Boston-Cambridge-Newton MA-NH CBSA.

22.     Each of these seven CBSAs is a relevant geographic market. A hypothetical monopolist over the sale of commercial health insurance to small groups in each of these markets would impose a small but significant and non-transitory increase in price, or SSNIP. A small group employer, faced with a significant price increase, cannot defeat the price increase by purchasing a large group product for which it is ineligible. This price increase would not be defeated by substitution outside the relevant market or by arbitrage (meaning a small group trying to repurchase insurance through another employer group).

### B.     Commercial Health Insurance Sold to CRC Groups

23.     The sale of commercial health insurance to CRC groups is a relevant antitrust product market. In New Hampshire, employers with between 51 and 99 full-time eligible employees represent a distinct segment of large group and are referred to as CRC employers (or CRC groups). CRC groups have different needs and make different buying decisions than small groups or even larger employers. Harvard Pilgrim and Tufts Freedom employ different sales strategies for this segment than they do for other types of employers.

24.     For CRC groups, similar to small groups, health plans are typically fully insured, which means that the employer pays a premium to the insurance company and in return the company covers the employees' healthcare costs. Insurers, including Harvard Pilgrim and Tufts Freedom, differentiate employers with 51 to 99 full-time eligible employees from other large group employers, and refer to these employers as the CRC segment. As with small groups, CRC groups also tend to be more local in nature than other large group employers, requiring a strong local provider network, as opposed to large group employers with more than 100 full-time eligible employees, which tend to require strong national provider networks.

25. Insurers offering commercial health insurance to CRC groups in New Hampshire can charge different prices to different employers. Group health plans for CRC groups, in contrast to larger group employers, are typically (although not exclusively) community rated by class, meaning that, when setting rates for CRC groups, the insurer first establishes a base rate determined by the medical costs of a class of similar groups, rather than upon the medical costs of the individual group seeking the plan. The insurer then uses this base rate, along with the individual employer's medical costs, to negotiate rates with the specific CRC group.

26. The Defendants target CRC groups directly through their sales efforts. For example, Tufts Freedom has focused its large group sales efforts on CRC groups since it began selling commercial health insurance in New Hampshire, and Harvard Pilgrim tracks CRC groups separately from other large group accounts. In addition, both Harvard Pilgrim and Tufts Freedom utilize specific pricing strategies for CRC groups. The Defendants have formulated these specific pricing strategies because CRC groups in New Hampshire are generally more price sensitive than large group employers with more than 100 full-time eligible employees.

27. As with commercial health insurance sold to small groups, New Hampshire law does not require that an insurer offer a CRC group product statewide and therefore permits an insurer to offer CRC plans only in certain counties. Accordingly, insurers can offer more expensive plans to CRC groups in one part of the state and less expensive plans in another part of the state. This allows insurers to charge different prices for different products to CRC groups based on where employees live and work. The Transaction is likely to substantially lessen competition for the sale of commercial health insurance to CRC groups in six separate CBSAs in New Hampshire: (1) the Manchester-Nashua CBSA, (2) the Concord CBSA, (3) the Laconia CBSA, (4) the Keene CBSA, (5) the New Hampshire counties (Grafton and Sullivan) of the

Lebanon NH-VT CBSA, and (6) the New Hampshire counties (Rockingham and Strafford) of the Boston-Cambridge-Newton MA-NH CBSA.

28. Each of these six CBSAs is a relevant geographic market. A hypothetical monopolist over the sale of commercial health insurance to CRC groups in each of these markets would impose a small but significant and non-transitory increase in price or SSNIP. This price increase would not be defeated by substitution outside the relevant market or by arbitrage.

## V. THE TRANSACTION IS PRESUMPTIVELY ILLEGAL

29. Mergers that significantly increase concentration in already concentrated markets are presumptively anticompetitive and therefore presumptively unlawful.

30. To measure market concentration, courts often use the Herfindahl-Hirschman Index ("HHI"). HHI is an accepted measure of market concentration. It is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers. For example, for a market consisting of four firms with shares of 30 percent, 30 percent, 20 percent, and 20 percent, the HHI is 2,600 ($30^2 + 30^2 + 20^2 + 20^2 = 2,600$). The HHI recognizes the relative size distribution of the firms in a market, ranging from 0 in markets with no concentration to 10,000 in markets where one firm has 100 percent market share. *See* Horizontal Merger Guidelines § 5.3. Courts have found that mergers that increase the HHI by more than 200 and result in an HHI above 2,500 in any relevant market or line of commerce are presumed to be anticompetitive.

### A. The Relevant Markets are Highly Concentrated and the Transaction Would Significantly Increase Their Concentration

31. In the small group market, based upon 2018 data, the combined market shares for Harvard Pilgrim and Tufts Freedom would range from over 45% to over 60% in each of the seven CBSAs. The Transaction would reduce the number of small group health insurers from

9

four to three, with the two largest insurers – Anthem and the merged Harvard Pilgrim/Tufts Freedom – possessing over 95% share in each of the seven CBSAs.  The Transaction would result in an HHI increase ranging from over 350 points to over 1,600 points with post-transaction HHIs of between 4,500 points and 7,500 points for commercial health insurance sold to small groups in New Hampshire.  Thus, the Transaction is presumptively unlawful.

32. For the CRC group market, based upon 2018 data, the combined market shares for Harvard Pilgrim and Tufts Freedom would range from more than 40% to over 65% in each of the six CBSAs.  The Transaction would reduce the number of CRC group health insurers from four to three, with the two largest insurers – Anthem and the merged Harvard Pilgrim/Tufts Freedom – possessing over 95% share in each of the six CBSAs.  The Transaction would result in an HHI increase ranging from over 200 to over 2,000 points in the CRC group market with post-transaction HHIs of just under 5,000 to almost 7,000 for CRC groups in New Hampshire.  Thus, the Transaction is presumptively unlawful.

### B. The Transaction Likely Would Harm Consumers in New Hampshire

33. Harvard Pilgrim and Tufts Freedom are particularly close competitors for commercial health insurance sold to small groups and CRC groups in New Hampshire with competition between the two insurers more robust for certain types of groups than the market shares would predict.  This is in part because Harvard Pilgrim and Tufts Freedom – two strong local health insurers that have not built national provider networks – are more attractive to small groups and CRC groups with higher percentages of employees resident in New Hampshire.  Similarly, because Harvard Pilgrim and Tufts Freedom have priced aggressively, the two appeal to small groups and CRC groups that have greater price sensitivity.

34.     Tufts Freedom's entry into New Hampshire in 2016 was backed by its Granite Healthcare provider partners, which formed the core of Tufts Freedom's provider network and extended it substantially below-market rates, enabling it to price aggressively. Using a combination of competitive pricing and a strong provider network, Tufts Freedom significantly grew its small group market share throughout New Hampshire after entering the state in 2016, with its share reaching almost 20% by 2019. Tufts Freedom achieved much of this growth at the expense of Harvard Pilgrim. As a result, and as Harvard Pilgrim recognized, the New Hampshire small group market became a three-player market, consisting of Harvard Pilgrim, Tufts Freedom, and Anthem.

35.     Tufts Freedom's aggressive pricing and growth caused Harvard Pilgrim to respond by significantly lowering prices and improving plan features to be more competitive with Tufts Freedom. This response included a strategy of targeting its competitors' "sweet spots," meaning lowering its rates on plans that competed with the most popular offerings of its competitors. Tufts Freedom observed this competitive reaction and in turn responded by announcing lower than expected rate increases. The Transaction would eliminate this fierce competition between Harvard Pilgrim and Tufts Freedom and its resulting benefits to consumers in New Hampshire.

36.     Direct competition between Harvard Pilgrim and Tufts Freedom in New Hampshire also has benefitted CRC groups. Again, Tufts Freedom entered New Hampshire pursuing a targeted pricing strategy that allowed it to gain market share. Harvard Pilgrim reacted to this competitive pressure resulting in lower health insurance prices for CRC groups.

37.     In addition to this price competition, New Hampshire consumers also have benefitted from competition between Harvard Pilgrim and Tufts Freedom on plan features and

quality of service for commercial health insurance sold to CRC groups.  For example, in 2019, Harvard Pilgrim developed four new no-coinsurance plans, which limited out-of-pocket expenses to insureds and offered different features, with the express purpose of making them more attractive to the insureds.  Just this year, Tufts Freedom offered consumers a novel telehealth option that included zero copayment in fully insured plans in order to drive innovation around this new emerging platform.

38.     Harvard Pilgrim and Tufts Freedom have engaged in head-to-head competition on price, plan features, and quality of service in the sale of commercial health insurance to small groups and to CRC groups in New Hampshire.  Eliminating this competition would likely result in higher prices, lower quality, and less customer choice in the sale of commercial health insurance to small groups and to CRC groups in New Hampshire.

## VI.     ABSENCE OF COUNTERVAILING FACTORS

39.     Other firms are unlikely to enter or expand into the relevant markets in a manner that would be timely, likely, or sufficient to replace the competition that would be lost as a result of the Transaction.

40.     Each of the relevant markets is characterized by high barriers to entry, including state licensing and regulatory requirements, the cost of developing a comprehensive provider network where employees live and work, the inability of insurers without significant membership to obtain competitive discounts from providers, and the development of sufficient business to permit the spreading of risk.

41.     The Transaction will not result in verifiable, transaction-specific efficiencies in the relevant markets sufficient to reverse the Transaction's likely anticompetitive effects.

## VII. VIOLATION ALLEGED

42. Plaintiffs allege and incorporate paragraphs 1 through 41 as if set forth fully herein.

43. Unless enjoined, the Transaction is likely to substantially lessen competition in the relevant markets, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

44. Among other things, the Transaction would:

   (a) eliminate present and future competition between Harvard Pilgrim and Health Plan Holdings in New Hampshire;

   (b) likely cause prices for commercial health insurance sold to small groups and to CRC groups in New Hampshire to be higher than they would be otherwise; and

   (c) likely reduce quality, service, choice, and innovation for commercial health insurance sold to small groups and to CRC groups in New Hampshire.

## VIII. REQUEST FOR RELIEF

45. Plaintiffs request that:

   (a) the Transaction be adjudged to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

   (b)  the Court permanently enjoin and restrain Defendants from entering into the Transaction contemplated in the Combination Agreement;

   (c) Plaintiffs be awarded the costs of this action, including attorneys' fees to the State of New Hampshire; and

   (d) Plaintiffs be awarded any other relief that the Court deems just and proper.

Dated:  December 14, 2020

Respectfully submitted,

**FOR PLAINTIFF UNITED STATES OF AMERICA:**

| | |
|---|---|
| /s/ Makan Delrahim | SCOTT W. MURRAY |
| MAKAN DELRAHIM | United States Attorney |
| Assistant Attorney General for Antitrust | |
| | |
| | By: /s/ Michael McCormack |
| | Michael McCormack |
| /s/ Michael Murray | Assistant U.S. Attorney, NH Bar. #16470 |
| MICHAEL MURRAY | United States Attorney's Office |
| Principal Deputy Assistant | 53 Pleasant Street |
|     Attorney General | Concord, NH 03301 |
| | Tel: (603) 225-1552 |
| | E-mail: michael.mccormack2@usdoj.gov |
| | |
| /s/ Kathleen S. O'Neill | |
| KATHLEEN S. O'NEILL | /s/ Catherine R. Reilly |
| Acting Deputy Assistant | CATHERINE R. REILLY |
|     Attorney General | GARRETT LISKEY |
| | JUSTIN DEMPSEY |
| | JEREMY EVANS |
| | CHRIS S. HONG |
| /s/ Eric D. Welsh | BARRY JOYCE |
| ERIC D. WELSH | JOHN P. LOHRER |
| Chief | NATALIE MELADA |
| Healthcare and Consumer Products Section | DAVID M. STOLTZFUS |
| | BRANDON STORM |
| | Attorneys for the United States |
| | |
| /s/ Jill C. Maguire | U.S. Department of Justice |
| JILL C. MAGUIRE | Antitrust Division |
| Assistant Chief | 450 5th Street, NW, Suite 4100 |
| Healthcare and Consumer Products Section | Washington, D.C. 20530 |
| | Tel.: (202) 598-2744 |
| | E-mail: catherine.reilly@usdoj.gov |

**FOR THE PLAINTIFF STATE**
**OF NEW HAMPSHIRE**
By its attorney,


/s/ Gordon J. MacDonald
GORDON J. MACDONALD
Attorney General of New Hampshire


/s/ Brandon H. Garod
BRANDON H. GAROD, NH Bar #21164
Senior Assistant Attorney General
Consumer Protection and Antitrust Bureau
New Hampshire Department of Justice
Office of Attorney General
33 Capitol Street
Concord, NH 03301
Phone: (603) 271-1217
brandon.garod@doj.nh.gov


/s/ Jennifer Foley
JENNIFER FOLEY, NH Bar #10519
Assistant Attorney General
Consumer Protection and Antitrust Bureau
New Hampshire Department of Justice
Office of Attorney General
33 Capitol Street
Concord, NH 03301
Phone: (603) 271-7987
Jennifer.Foley@doj.nh.gov